## NORTHERN CENTRAL DIVIDEND CASES.*

*Right to extra cash and stock dividends as between life tenants and remaindermen : corpus or income?*

Pursuant to a resolution of the Board of Directors declaring that the capital stock of a railway company be increased for the purpose of a stock dividend—the stockholders of the company voted to increase the capital stock for such stock dividend, representing and based upon the expenditures for additions and betterments to the company's property, made from time to time out of its surplus earnings.   The increase of the capital stock was then approved by the Public Service Commission, after the filing of a petition by the company setting forth that the new stock was to be used primarily for the purpose of discharging the company's obligations to its stockholders on ac-

---

*The docket titles of these cases, which were argued together, are: No. 56—Safe Deposit and Trust Company, Trustee, *vs.* Mary V. Miller, *et al.*  No. 57—Mary V. Miller, *et al. vs.* Safe Deposit and Trust Company, Trustee.  No. 58—Bertha White, *et al. vs.* Safe Deposit and Trust Company, Trustee.  No. 59—Safe Deposit and Trust Company, Trustee, *vs.* Nathaniel W. James, *et al.*  No. 60—Isabell M. Gambell *vs.* Safe Deposit and Trust Company, Trustee.  No. 61— Safe Deposit and Trust Company, Trustee, *vs.* Isabell M. Gambell. No. 62—Sherwin Mackenzie, *et al. vs.* Safe Deposit and Trust Company, Trustee.  No. 63—Safe Deposit and Trust Company, Trustee, *vs.* Sherwin Mackenzie.  No. 70—Robert T. Wilson, Executor, *vs.* Safe Deposit and Trust Company, Trustee.  No. 71—Safe Deposit and Trust Company, Trustee, *vs.* Robert T. Wilson, Executor.  No. 72—Henry J. Waters, Guardian, *vs.* Safe Deposit and Trust Company, Trustee.  No. 73—Olivia C. Turnbull *vs.* Safe Deposit and Trust Company, Trustee.  ·No. 74—Safe Deposit and Trust Company, Trustee, *vs.* Olivia C. Turnbull.  No. 75—Safe Deposit and Trust Company, Trustee, *vs.* Henrietta G. Buchanan.  No. 76—Henrietta G. Buchanan *vs.* Safe Deposit and Trust Company, Trustee.  No. 77— Safe Deposit and Trust Company, Trustee, *vs.* Church Home Infirmary of the City of Baltimore.  No. 78—Church Home Infirmary of the City of Baltimore *vs.* Safe Deposit and Trust Company, Trustee.

count of net earnings previously applied in betterments or invested in stocks and bonds and then held as assets in the treasury of the company; and the Public Service Commission passed an order authorizing the additional stock to be issued and used for that purpose.

A dividend of 40%, payable in stock, being then declared, such shares of stock so issued were *held* to be income or corpus of the trust estate, as between life tenant and remainderman, according to the rule of apportionment laid down in *Thomas* v. *Gregg,* 78 Md. 545, and *Atlantic Coast Line Dividend Cases,* 102 Md. 73.                                      pp. 28-29

It was further *held,* that it should be determined by agreement or by testimony what part of the accumulated earnings represented by the stock dividend of 40% accrued in the lifetime of any particular testator. Such part would constitute corpus, and the balance would constitute income for the life tenants.                                              p. 29

A previous dividend in stock also *held* to be declared out of the earnings, and the same rule of apportionment applied; and if such earnings or any part thereof had been distributed to life tenants, they should be accounted for in the distribution of the 40% stock dividend to be thereafter made.            p. 29

Further *held,* that the Court was not required to enter upon an examination of the accounts of the railway company, but that the declarations of the company, that the dividend represented earnings or income, was binding upon all parties.    p. 28

Two cash dividends, under the special circumstances of the case, *held* to be governed by the rule laid down in *Quinn* v. *Safe Deposit and Trust Company,* 93 Md. 285, and to go to the life tenants.                                          p. 28

As between successive owners of a share, it was *held,* that a cash dividend belongs to him who is the owner of the share at the time the dividend is declared; and that this is true, although there is a future day of payment.                  pp. 29-30

Where there are successive interests in the same share, as in the case of a life tenant and remainderman, there will be no

apportionment of a cash dividend when the life tenancy expires between dividend days.                    pp. 29-30

Excess market value over the par value of a stock is not to be credited to corpus, although there is authority for this proposition in other jurisdictions.                    p. 30

*Decided April 14th, 1915.*

Nine appeals from the Circuit Court of Baltimore City (AMBLER, J.), and eight appeals from Circuit Court No. 2 of Baltimore City (AMBLER, J.).

The facts are stated in the opinion of the Court.

The causes were argued together before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*J. Hemsley Johnson,* for Robert T. Wilson, executor *et al.,* appellants and appellees.

*John J. Donaldson* and *German H. H. Emory (Frank, Emory* and *Beeuwkes* on the brief), for Henry J. Waters *et al.,* appellants and appellees.

*Edwin G. Baetjer (Venable, Baetjer & Howard* on the brief), for Safe Deposit and Trust Company, appellee and appellant.

BURKE, J., delivered the opinion of the Court.

The appeals in the above entitled cases were taken from eight decrees dated January 8, 1915. Four of these decrees were passed by the Circuit Court of Baltimore City, and four by Circuit Court No. 2 of Baltimore City. The appeals involve: *First,* questions arising between life-tenants and

remaindermen over certain dividends declared by the North-
ern Central Railway Company; *and secondly,* questions of
apportionment of such dividends between life-tenant and
remaindermen as may be determined to be income. The
determination of the questions involved can be · readily
reached by the application, to the facts of each particular
case, of principles which appear to be well settled in this
State. The amounts involved are very large, and the decision
which we make on these appeals will be of great importance
to Trustees and others holding stock of the Northern Cen-
tral Railway Company and interested in the dividends which
form the subject of this controversy. As the decision of each
case depends upon the same general principles, all the cases
will be disposed of in one opinion to be filed in No. 56—the
case of *Safe Deposit and Trust Company of Baltimore,
Trustee,* v. *Mary V. Miller, et al.*

A statement of what we regard as the controlling and deter-
mining facts upon which the main questions in the case
depend will now be made:

The Northern Central Railway Company is a corporation
under the laws of Maryland and Pennsylvania, operating a
line of railroad from Baltimore, Md., to Sunbury, Pa., with
a number of branches, and has for many years been physically
connected with the lines of the Pennsylvania Railroad Com-
pany. Prior to 1900 the Pennsylvania Railroad and its sub-
sidiaries acquired approximately one-half of the stock of the
Northern Central Railway, and in 1906 acquired an actual
majority of said stock. For many years there had been a
controversy or difference of opinion between the Pennsyl-
vania Railroad and the minority stockholders of the Northern
Central Railway, based upon the contention of the minority
stockholders, among others, that too large a proportion of the
real earnings of the Northern Central Railway were withheld
from dividend distributions, and with the accounting methods
or principle by which the earnings of the Northern Central
Railway were ascertained.

The controversy resulted in 1909 in the appointment of a committee to consider what was described as permanent operating relations between the Pennsylvania Railroad and the Northern Central Railway, and intended to insure to the stockholders a fixed, but larger income return both on account of past and of future earnings. After prolonged negotiations a settlement was reached which provided: *First,* for a lease of the Northern Central Railway to the Pennsylvania Railroad at an annual rent, over and above all costs of operation and maintenance, and available for distribution as dividends to the stockholders of the Northern Central Railway of $2,166,360.00, this amount being an increase over the dividends paid annually for the preceding ten years of $618,-964.00; *second,* the declaration of a stock dividend of 40%, amounting to $7,734,050.00 and a cash dividend of 10% amounting to $1,934,250.00.

At a meeting of the stockholders of the Northern Central Railway held on November 2, 1910, the settlement was approved, and the lease was authorized and the capital stock of the company increased by an amount sufficient to provide for the stock dividend, and the dividends were approved. The resolutions of this meeting recited that the question of the proposed increase of the capital stock of the company of 154,-741 shares of the par value of fifty dollars each, over and above the 368,851 shares of the par value of fifty dollars each, then issued and outstanding, and the issuance thereof having been, pursuant to resolution of the board of directors and after sixty days' notice given and published as required by law, submitted to the meeting for the consent and authority of the stockholders, it was

"*Resolved,* That the consent and authority of the stockholders of this company be, and they are hereby, given to the proposed increase of said company's capital stock of one hundred and fifty-four thousand, seven hundred and forty-one (154,741) shares, of the par value of fifty (50) dollars each, over and above the three hundred and eighty-six thousand, eight hundred

and fifty-one (386,851) shares, of the par value of fifty (50) dollars each, now issued and outstanding, and the issuance and disposition of said increase primarily for the purpose mentioned and prescribed in the resolution of the Board of Directors of 14th July, 1910, viz: *as and for a stock dividend upon the company's present outstanding capital stock, representative of and based on expenditures for additions and betterments of the company's property made from time to time out of its surplus earnings to a larger amount in the aggregate,* and which *might otherwise have been available for and distributable* as dividends among its stockholders, if the Directors had so determined, etc."

The report of the board of directors of the company for the year 1910, reporting the capitalization of the extraordinary expenditures out of income and the extraordinary expenditure fund is here transcribed:

"During the year the capital accounts of your company were increased $6,638,155.77, distributed as between Cost of Road, $6,057,252.02, and Cost of Equipment, $580,903.75, representing a portion of expenditures for new construction, equipment and real estate during *the ten years ended December* 31, 1909, *heretofore expended out of surplus income, and which have not been heretofore entered in your capital accounts.* This action was taken to place upon your books the cost of additions and betterments, which were, in the judgment of the Board, properly considered a capital investment, and also, with other changes, to conform to the uniform accounting regulations and new form of General Balance Sheet promulgated by the Interstate Commerce Commission, and the State of Maryland."

The controversies between the minority stockholders and the Northern Central Railway Company, above referred to, had been of long standing. The character of the controversy

and the consideration for the settlement are shown in the statement of the claim made on behalf of the minority stockholders.   In some instances these claims were made as claims of right against the railroad company, whether the lease was made or not, and in part were contingent upon the execution of the lease.   The settlement that was made included the execution of the lease, and the issue of the stock dividend as inseparable parts of a single transaction.

The claims made by the stockholders were as follows:

1. That the Northern Central Railway had an earning capacity far in excess of the amount shown by the company's statements, and in excess of the amount distributed as dividends, and the stockholders were entitled as a matter of right to an increase in the dividend.

2. That this large earning capacity had existed for many years; that a good portion of the earnings of the company had been diverted to capital purposes through the Extraordinary Expenditure Fund, and also through the charge of capital items directly to income or to expense of operation.

3. For distribution of the increase in the sales value of the securities over the book value.

For the distribution of the surplus of the Union Railroad Company.

For the increase in the value of the Insurance Fund.

By a small minority of the stockholders the validity of the sale to the Pennsylvania Railroad of part of the stock of the Union Railroad was also questioned.

The amounts involved in the claims or contentions of the various parties were accurately ascertained by expert examination, but the settlement was not based upon any exact agreement between the parties as to the amounts to which the stockholders might be entitled.

The fluctuating market value of the stock of the Northern Central Railway Company between the years 1900 and 1914 is shown by the following table:

| Years. | High. | Low. |
|--------|-------|------|
| 1900............ | 100 | 82½ |
| 1901............ | 106½ | 88½ |
| 1902............ | 125¼ | 104 |
| 1903............ | 118 | 84½ |
| 1904............ | 109½ | 71 |
| 1905............ | 110¾ | 99 |
| 1906............ | 111¼ | 97 |
| 1907............ | 97 | 78½ |
| 1908............ | 102 | 80 |
| 1909............ | 121½ | 100 |
| 1910............ | 132 | 115 |
| 1911............ | 130¾ | 121 |
| 1912............ | 130 | 121 |
| 1913............ | 123 | 106½ |
| 1914............ | 129½ | 85 |

Since the payment of the extraordinary dividend and the execution of the loan the value of the stock has varied between $82 and $85 per share.

Owing to threatened litigation it was made one of the terms of the agreement between the Northern Central Railway Company and the Pennsylvania Railroad that the latter railroad should not be obliged to execute the lease until so advised by counsel, but that the lease when executed should take effect as of January 1, 1911.   The lease was actually executed on July 29, 1914.   About this time there was formally declared and issued the dividends provided for in the settlement between the company and its stockholders, that is to say: First, a stock dividend of 40%; second, a cash dividend of 10%.   The aggregate value of these dividends is:

|  | Par. Value. | Cash Value. |
|--------|-------------|-------------|
| 40%........ | $7,734,050.00 | $13,147,885.00 |
| 10%........ | 1,934,250.00 | 1,934,250.00 |

There was paid at this time an extraordinary dividend of 8% on the capital stock of the company as increased by the

issue of the stock dividend. This latter dividend, while in form a dividend of 8% on the capital stock plus the 40% increase, is in fact a dividend of 28% upon the 40% stock dividend alone, said dividend arising as follows:

During the interval between the authorization and the execution of the lease, that is approximately from January 1, 1911, to July 1, 1914, the Northern Central Railway was operated as theretofore, without respect to the lease. There was annually paid to the stockholders a dividend of 8% on the original 100%, but not on the 40% increase. The annual rent reserved by the lease, however, exceeded this dividend by the sum of $618,964, or 8% annually upon the amount of the 40% stock dividend. After the execution of the lease and in the adjustment of the accounts between the lessor and lessee companies for the period intervening between January 1, 1911, and July 1, 1914, the dividends so paid on the original 100% to the stockholders were treated as if it had been a part of the rent paid by the Pennsylvania Railroad, lessee, to the Northern Central Railway, and distributed by the latter company to its stockholders and as a credit on said rent. This left the lessee in arrears for so much of the rent as was equal to a dividend of 8% on the 40% stock dividend, or for seven semi-annual installments from January 1, 1911, to July 1, 1914, at 4% each, or a 28% dividend on the increase or stock dividend, and this dividend was the proceeds of the liquidation of these arrears.

At a meeting of the Board of Directors of the Northern Central Railway Company held December 11, 1906, the following resolution declaring a stock dividend was passed:

"*Resolved,* That, to represent a portion of the surplus profits of the company hitherto expended in betterments to its property, there be declared an extra dividend of 6 25/100 Dollars upon each share of the present capital stock as registered on the books of the company at 3 P. M., December 31st, 1906, the said extra dividend to be payable on and after January 15th, 1907, in the stock of the company at its par

value of Fifty Dollars per share, the certificates for the same to be dated January 1st, 1907, and to be entitled to participate in any dividends that may be declared after said date, scrip to be issued for any fraction of a share, redeemable in the stock of the company, when presented in sums of Fifty Dollars or multiples thereof, under such regulations as the Board may prescribe."

Under the Public Service Commission law of the State it was necessary to secure the approval of the Public Service Commission to the settlement, terms and conditions of the lease above mentioned. Accordingly the Northern Central Railway Company on the 5th day of December, 1910, filed a petition with the Commission asking it to approve the proposed lease of its railway, property and franchises, to the Pennylvania Railroad Company on the terms and conditions set out in the lease, a copy of which was filed with the petition, and also asking the Commission to pass an order— "authorizing said Railway Company to issue capital stock, that is to say, one hundred and fifty-four thousand, seven hundred and forty-one (154,741) shares of the par value of fifty ($50) dollars per share, *to be used primarily for the purpose of discharging said company's obligation to its stockholders on account of net earnings of said company heretofore applied in betterments and improvements or invested in the stocks and bonds of other companies and now held as assets in the treasury of said railway company.*"

The Pennsylvania Railroad Company also filed its petition asking that the lease be approved by the Commission.

The petitions of the two companies were resisted before the Commission, and, after a full hearing, the objections were overruled, and on the 2nd day of May, 1911, the Public Service Commission of Maryland passed the following order:

"1.   That the proposed lease by the Northern Central Railway Company of its railway, property and franchises to the Pennsylvania Railroad Company, on

the conditions, and in the form shown in these pro-
ceedings (being Petitioner's Exhibit K), filed with the
petition of the said railway company, be, and the same
hereby is, approved by this commission.

"2. That the said Northern Central Railway Com-
pany be, and hereby is, authorized to issue additional
capital stock as follows, that is to say: One hundred
and fifty-four thousand, seven hundred and forty-one
(154,741) shares, of the par value of Fifty ($50)
Dollars per share, to be *used for the purpose of dis-
charging said company's obligation to its stockholders
ascertained and established as aforesaid on account of
net earnings of said company heretofore applied in bet-
terments or improvements or invested in the stocks
and bonds of other companies and now held as assets
in the treasury of said railway company,* the commis-
sion being of the opinion that the use of the capital to
be secured by the issue of such stock is reasonably re-
quired for said purpose of said railroad corporation."

On July 14, 1914, after the approval of the lease by the
Public Service Commission, the Board of Directors of the
Northern Central Railway formally declared the stock and
cash dividends referred to in the negotiations which led to
the execution of the lease. In the meantime the Northern
Central Railway Company paid regularly the 8% on its out-
standing stock, and in the adjustment of the accounts between
the companies these dividends were treated as if they con-
sisted of rent paid under the lease and distributed as divi-
dends. The lease, when executed, became effective as of
January 1, 1911. This left the Pennsylvania Railroad
Company, the lessee, in arrears for three years for so much
of the rent as equalled 8% on the 40% stock dividend. On
July 27, 1914, the lessee paid these arrears, that is to say,
three and one-half years at 8% on the 40% stock dividend,
or in other words, seven semi-annual dividends.

The surplus of the Northern Central Railway Company
on December 13, 1910, as shown by its books,
was. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$3,066,389.18
To this was added income expended in better-
ments and restored. . . . . . . . . . . . . . . . . . . 6,638,155.77

Total. . . . . . . . . . . . . . . . . . . . . . . . . . . .$9,704,544.95
Less an adjustment. . . . . . . . . . . . . . . . 47,153.72

$9,657,391.23

To this amount the stock and cash dividends declared July
14, 1914, were charged. The four dividends declared by the
railway company, under the circumstances stated are:

1. The stock dividends of 12½% declared December 11,
1906.

2. The cash dividend of 8% declared July 10, 1914.

3. The cash dividend of 10% declared July 14, 1914.

4. The stock dividend of 40% declared July 14, 1914.

There can be no doubt, we think, that the stock dividend
of 12½% and the two cash dividends of 8% and 10% re-
spectively are to be treated as income. This is in effect a
*consessum* in the case. They are based upon earnings of the
company. The real contention in the case arises over the
40% stock dividend. That dividend was intended to repre-
sent surplus of the company to which its stockholders were
entitled.

In the brief of the counsel for the Safe Deposit and Trust
Company two propositions with respect to this dividend were
urged upon the Court: First, that it represents *corpus,* in
that it is a distribution of the rent received for the transfer
of the leasehold interest of the entire property of the com-
pany; and secondly, that the dividend is to a large extent
not based upon, or representative of earnings. These propo-
sitions were urged with great earnestness and ability in the
oral argument. It was contended that the books and ac-
counts of the company extending over a number of years

showed that many of the items represented in the dividend were *corpus*. On the other hand, the counsel for the life tenants contended in their brief and argument that the accumulated earnings shown by the company's books, and which are represented by the dividend should be augmented by items and additions improperly excluded as income. Under the circumstances the Court is not required to enter upon an examination and revision of the accounts of the railway company, but will follow the precedent established in *Quinn* v. *The Safe Deposit and Trust Company,* 93 Md. 285, and in the *Atlantic Coast Line Dividend Cases,* 102 Md. 73, and hold the declarations of the company and its stockholders that the dividend represents earnings or income binding upon all parties to these appeals. In *The Atlantic Coast Line Dividend Cases, supra,* the Court was asked to examine the accounts of the company and determine, contrary to the resolutions of the Board of Directors of the Railway Company, whether the dividends represented *corpus* or *income*. This the Court declined to do, saying that "it is well settled in this State, since the adjudication in *Thomas* v. *Gregg,* 78 Md. 545, and *Quinn* v. *The Safe Deposit and Trust Company,* 93 Md. 285, that there are cases where stock dividends, such as the one now under consideration, should be held to be income and not capital. The determination of the question depending 'upon the substance and intent of the action of the corporation as manifested by its vote or resolution.' "

Our conclusion, based upon the action of the directors and stockholders of the company, is that the stock dividend of 40%, like the other dividends in the case, is income.

The next question is: How are these dividends to be apportioned between the life tenants and remaindermen? The rule of apportionment is well established in this State by the cases of *Thomas* v. *Gregg,* 78 Md. 545; *Quinn* v. *Safe Deposit and Trust Company,* 93 Md. 285; *Atlantic Coast Line Dividend Cases, supra; Coudon* v. *Updegraf,* 117 Md. 71; *Ex parte Humbird,* 114 Md. 627, and *Foard* v. *Safe Deposit and Trust Company,* 122 Md. 476. In *Thomas* v.

*Gregg, supra,* it was held that a stock dividend representing earnings devoted to betterments will be apportioned between life tenants and remaindermen where earnings accruing during the life estate are included in the income; and in *Quinn* v. *Safe Deposit and Trust Company, supra,* it was held that a cash dividend goes to the life tenant without regard to the time when the earnings or income accrued. Applying the rule laid down in *Thomas* v. *Gregg, supra,* the apportionment of the stock dividends must be made as follows:

1. As to the 12½% stock dividend declared on December 11, 1906. Such part of the earnings as may be represented in that dividend which accrued in the life time of the settlor must be treated as *corpus,* and if such earnings, or any part thereof have been distributed to life tenants they must be accounted for in the distribution to be hereafter made in these cases.

2. As to the 40% stock dividend declared July 14, 1914. The same rule of apportionment must be applied to this dividend. The earnings which it represents are shown by the record, and were accumulated "during the ten years ended December 31, 1909," as stated in the report of the directors to the stockholders for the year 1910. It may be determined by agreement, or by testimony what part of these accumulations accrued in the life time of any particular testator. Such part would constitute *corpus,* and the balance distributed to the life tenants. It ought not to be difficult to reach a fair and equitable apportionment under this rule of the total earnings for the period named.

3. As to the two cash dividends. The distribution of these dividends are governed by the rule laid down in *Quinn* v. *Safe Deposit and Trust Company, supra,* and go to the life tenants. "As between successive owners of a share, the dividend belongs to him who is the owner at the time it is declared; and this is true although there is a future day of payment. Such is the rule also when there are successive interests in the same share, as in the case of life tenant and

remainderman; there will be no apportionment when the life tenancy expires between dividend days." *France on Principles of Corporation Law,* 280.

The stock of the Northern Central Railway Company, as shown by the figures given above, had for some years prior to the lease a fluctuating market value. Upon the declaration of the stock dividend the market value of the stock declined from $130 per share to $85. The position is taken by the trustee that in the adjustment of the rights between the life tenants and remaindermen the excess market value over the par value at the date on which the dividend was declared should be credited to *corpus.* This rule has not been adopted in this State, and would in our opinion not be just to the life tenant, although there is authority to support it in other jurisdictions. Many factors enter into the value of the stock of a corporation. The retention by the company of millions of dollars which should be distributed to its stockholders gives market value to the stock. The earning capacity of a corporation contributes to market value, and this capacity in turn is affected by many things. The general conditions of trade, available working capital, equipment, efficiency and economy, reflected in management, and many other considerations. But stock dividends are not based upon the market value of the stock; but upon accumulated earnings of the company. In the declaration of such dividends the market value of the stock is not considered. The dividend represents the stockholder's proportion of the earnings of the company awarded to him by its authority. Such proportion of the earning represented by the dividend as accrued during the life tenancy belongs to the life tenant. That proportion is his property, and no part of its value should be taken from him and given to another. If it declines in value or becomes valueless he must bear the loss; if it appreciates in value it is an advantage to which he is justly entitled. In the *Atlantic Coast Line Cases, supra,* the 20% stock dividend, which formed the subject of the litigation, was declared by a resolution of the Board of Directors on November 15, 1904.

The par value of the stock was $100 per share. The record in that case showed that in Novmebr, 1904, the stock was worth about $150 per share. After the payment of the extra dividend it was worth about $120 per share; and on March 3, 1905, it was worth $140 per share. In the briefs filed in that case it was stated that the par value of the 20% stock dividend was $7,300,000.00, and that the market value was $10,950,000.00. The Court held the dividend to be income, and decreed that the certificates therefor should be transferred to life tenants, notwithstanding the large excess in market value over the par value of the stock.

In all the cases involving dividends which have come before this Court it has been uniformly held that if such dividends represented earnings accruing during the life tenancy, they pass to the life tenant, but if they represent in part earnings accrued during the life tenancy, the dividend should be apportioned, and that the proportion of stock which represented earnings during the life tenancy goes to the life tenant, and the part which accrued before the creation of the trust constitutes *corpus.* This method of apportionment was declared in *Thomas* v. *Gregg, supra,* to be "an equitable one."

We do not deem it necessary to prolong this opinion by a discussion of the separate cases. The accounts in each case may be readily stated in conformity with the general principles herein laid down to be applicable to all the cases. As each decree properly held the cash dividends constituted income but erroneously held that the 40% stock dividend to be *corpus,* all the decrees appealed from must be reversed in part and affirmed in part.

> *The decree in each case is reversed in part and affirmed in part, and the cause in each case remanded, the costs in each appeal to be paid by the Safe Deposit and Trust Company, Trustee, out of funds belonging to each trust estate involved in each appeal.*