In the Matter of the Judicial Settlement of the Intermediate Account of the ROCHESTER TRUST AND SAFE DEPOSIT COMPANY, as Successor Executor, etc., of ARTHUR T. HAGEN, Deceased. EMMA J. HAGEN, Appellant; ROCHESTER TRUST AND SAFE DEPOSIT COMPANY and Others, Respondents.

Fourth Department, January 4, 1933.

*Ernest C. Whitbeck*, for the appellant.

*Thomas H. Remington*, special guardian for the infant remaindermen, respondents.

*Mann, Strang, Bodine & Wright*, for the successor executor, respondent.

EDGCOMB, J.  Upon this appeal we are confronted with the perplexing problem of the proper apportionment which should be made of a stock dividend between the life tenant of a trust and the remaindermen.  The question is troublesome, and the decisions upon the subject are by no means harmonious.

Arthur T. Hagen died on the 13th day of January, 1917.  He left certain property in trust for the benefit of his wife, and directed his trustee to pay the net income to her as long as she lived.  Upon her death the property was given to the donor's grandchildren.

The corpus of the trust fund was made up of $22,520.75 in cash, and certain securities owned by decedent at the date of his death, and which were valued at the sum of $357,800.  Among these securities were 700 shares of seven per cent participating cumulative preferred stock of the General Baking Company, appraised at the sum of $24,500, and 40 shares of the common stock of the same corporation, appraised at $160.

The General Baking Company was organized in 1911.  It had an authorized capital of 100,000 shares of seven per cent cumulative participating preferred stock of the par value of $100 each, and 100,000 shares of common stock of the par value of $100 each. When Mr. Hagen died, 59,250 shares of the preferred stock and 34,000 shares of the common had been issued and were outstanding.

Prior to January 1, 1921, the baking company had failed to pay the dividends on its preferred stock in full as they became due, and on December 14, 1920, its board of directors adopted a resolution declaring a twenty per cent dividend, payable December 31, 1920, being the total amount of the accumulated dividends on the preferred stock to October 1, 1920, such dividend to be paid in preferred stock at par from the authorized and unissued preferred stock of the corporation, in lieu of cash, and in satisfaction of the accrued cumulative dividends.

There was ample surplus to warrant the issuance of this additional stock without invading the principal.  The surplus had increased from $1,181,957.61 at the close of 1916 to $1,477,565.32 on December 31, 1920, notwithstanding the fact that substantial amounts had been charged off each year as a reserve for depreciation of plant and equipment, and despite the fact that there had been deducted from surplus and added to capital the sum of $1,132,800, the value of the additional stock issued to pay this dividend.

Of the 140 shares of preferred stock thus acquired by the trustee, 26 shares, representing the accumulations which had been added to the surplus of the corporation from the death of Mr. Hagen to the date of the declaration of the dividend, were allotted to the life beneficiary, and the other 114 shares were added to the corpus

of the trust fund, upon the theory that they represented the accumulated dividends on the preferred stock which had accrued prior to Mr. Hagen's death. The propriety of this allocation is not questioned. This increased the holding of the trustee to 814 shares of the preferred stock of the corporation.

On January 1, 1922, the capital structure of the baking company was completely changed. Its board of directors adopted a resolution on December 13, 1921, authorizing the issuance, as of January 1, 1922, of 70,578 shares of preferred stock with no nominal or par value, and 138,578 shares of common stock with no nominal or par value, to take the place of the then outstanding stock of the corporation, and to be issued to the respective holders of the old stock at the rate of one share of the new preferred and one share of the new common for each share of outstanding preferred, and two shares of the new common for each share of the old. The new preferred stock carried interest at the rate of eight dollars per share per annum, and was cumulative, but did not have the participating feature which the old stock had.

The trustee accepted this offer, and exchanged its 814 shares of the old stock for 814 shares of. the new preferred and a like number of shares of the new common. The 40 shares of old common which had been turned over to the trustee when the trust was created had been sold, and could not be exchanged for the new common.

A year later still another change was made in the capital structure of the corporation. On December 13, 1922, the board of directors passed a resolution declaring a stock dividend of 277,156 shares of common stock to the holders of record of the outstanding common stock at the close of business on December 22, 1922, at the rate of two additional shares for each share of the old, to be paid out of the then authorized and unissued common stock of the company.

With the acquisition of this additional block of 1,628 shares, the trustee held 814 shares of the preferred stock of the company and 2,442 shares of the common.

On October 1, 1925, an offer was made to each holder of common stock of the General Baking Company to exchange his holdings for the stock of the General Baking Corporation, the transfer to be on the basis of two shares of class A and six shares of class B of the baking corporation for one share of the common stock of the General Baking Company. The trustee accepted this offer, and received for its 2,442 shares of common stock of the General Baking Company 4,884 shares of class A and 14,652 shares of class B of the General Baking Corporation.

On October 20, 1925, the trustee sold the 4,884 shares of class

A stock of the General Baking Corporation at 64¾, receiving therefor the sum of $315,938.94.

It thus appears that out of the original investment of 700 shares of seven per cent preferred and 40 shares of common stock of the General Baking Company, which was turned over to the trustee at the inception of the trust, and which was valued at the sum of $24,660, there has been realized $1,378.40 from the sale of the 40 shares of common stock, and $315,938.94 from the sale of the 4,884 shares of class A stock of the General Baking Corporation, making a total of $317,317.34, to say nothing of annual dividends which have been paid from time to time, and that there is still left in the corpus of the trust fund 814 shares of new preferred stock of the baking company, drawing eight dollars per year dividend, and 14,652 shares of class B stock of the General Baking Corporation, which was selling on the market at the time of the trial for ten dollars per share.

The ownership of this stock dividend of 1,628 shares of common stock of the General Baking Company, and the proceeds thereof received from its exchange for the stock of the General Baking Corporation, is the question which must be determined here.

When the matter first came before the surrogate, it was held that Mrs. Hagen was entitled to the entire block of 1,628 shares. Upon reargument, 897 shares were allocated to corpus and 731 to income, upon the theory that the 897 shares were necessary to preserve the corpus of the estate intact. From the decree entered upon this decision the life beneficiary has appealed.

The question of whether a stock dividend constitutes principal or income is now settled by statute. The Personal Property Law of this State provides as follows:

"§ 17-a. Stock dividends. Unless otherwise provided in a will, deed or other instrument, which shall hereafter be executed and shall create or declare a trust, any dividend which shall be payable in the stock of the corporation or association declaring or authorizing such dividend and which shall be declared or authorized hereafter in respect of any stock of such corporation composing, in whole or in part, the principal of such trust, shall be principal and not income of such trust. The addition of any such stock dividend to the principal of such trust, as above provided, shall not be deemed an accumulation of income within the meaning of this article."

This provision in a somewhat different form was added to the Personal Property Law by chapter 452 of the Laws of 1922. It was amended and enacted in its present form in 1926, and took effect May seventeenth of that year. (Laws of 1926, chap. 843.)

This section is not retroactive. It applies only to trusts created subsequent to May 17, 1926. (*Matter of Lawton*, 133 Misc. 820; affd., 227 App. Div. 830.)

The trust with which we are dealing here came into existence on January 13, 1917, the day on which Mr. Hagen died. The rule is well settled that unless there is something in a testator's will which indicates a contrary design, the trust has its inception on the day of the donor's death. (*Matter of Bird*, 241 N. Y. 184; *Matter of Stanfield*, 135 id. 292.)

We find nothing in decedent's will which takes this case out of the ordinary rule.

The trust having been created prior to the enactment of section 17-a of the Personal Property Law, it is governed by the law as it existed prior to May 17, 1926, and not by the mandate of the statute. We must, therefore, look to the decisions of the courts for the rule to be adopted here.

There is a wide difference of opinion in the various States as to the proper apportionment of stock dividends between corpus and income. The courts of this State are committed to the so-called American or Pennsylvania rule. We have never followed or adopted the Massachusetts doctrine. So far as this State is concerned, the law seems to be well settled that, in the absence of a contrary intent on the part of the founder of the trust, dividends received upon stock held by the trustee should be allocated between the life beneficiaries and the remaindermen as follows: (1) Ordinary dividends should be paid to the life beneficiary regardless of the time when the surplus out of which they are payable was accumulated; (2) extraordinary dividends, payable from the accumulated earnings of the corporation, either in cash or in stock, belong to the life beneficiary, unless they encroach in whole or in part upon the capital of the trust fund, as received from the testator or the founder of the trust, or as invested in the stock, in which case such extraordinary dividends should be returned to the trust fund, or apportioned between the corpus of the trust and the life beneficiary in such a way as to preserve the integrity of the fund. The principal of the trust estate should be preserved, and not impaired by distribution of any part thereof to the life beneficiaries. (*Matter of Osborne*, 209 N. Y. 450; *United States Trust Co.* v. *Heye*, 224 id. 242; *Matter of Schaefer*, 178 App. Div. 117; affd., 222 N. Y. 533; *Bourne* v. *Bourne*, 240 id. 172; *Equitable Trust Co.* v. *Prentice*, 250 id. 1; *Pratt* v. *Ladd*, 253 id. 213.)

While the principle laid down for the guidance of the court is simple, its application is many times fraught with difficulty. As is pointed out by Judge ANDREWS in *Bourne* v. *Bourne* (240 N. Y.

172, 175), we do not always apply any one formula, and, as is stated by Judge CHASE in *Matter of Osborne* (209 N. Y. at p. 475), the court in each case should look into the facts and circumstances surrounding the transaction, and determine the nature of the dividend and the rights of the contending parties, and make its decision in accordance with justice and equity.

It is perfectly proper and competent for a testator to frame his will in such language as to cover every conceivable receipt of his trustee, and a clear expression of his purpose would be decisive of the disposition to be made of extraordinary dividends, unless the result would run counter to some statute.

The special guardian for the infant remaindermen contends that the language of the will indicates the testator's intention to give the life tenant the regular income, but not the extraordinary dividends or profits. If that is so, the beneficiary was not entitled to any part of this stock dividend, and the surrogate erred in giving her 731 shares. But the remaindermen have not appealed from the decree.

But I do not take this view of the meaning to be derived from the language used by the testator. He directs his trustee to pay to his wife " the net income " from the trust fund. He does not limit the income to the ordinary gain or profit of property. True, there is nothing to indicate that he anticipated such fabulous profits from this investment, and it would not be surprising if he did not dream of such a situation. Nevertheless, he directed that the net income, without any limitation whatever, be paid to the beneficiary of the trust. Under these circumstances, it is presumed that decedent, by the use of the word " income," intended to include everything in the way of increase or profit accruing from the corpus of the trust fund, which does not decrease the original value of the capital which it represented. (*United States Trust Co.* v. *Heye,* 224 N. Y. 253, 254; *Boyer's Appeal,* 224 Penn. St. 144, 153.)

With these rules in mind, we now turn our attention to the circumstances under which this stock dividend was declared, and the financial condition of the baking company at the time, in an endeavor to ascertain whether the funds used for the dividend were accumulated prior or subsequent to Mr. Hagen's death.

The balance sheet of the General Baking Company for the year ending December 30, 1916, fourteen days before testator's death, shows the capital account of the corporation to be $9,325,000 — $5,925,000 for preferred and $3,400,000 for common — and the surplus to be $1,181,957.61, after deducting a substantial amount

for depreciation of plant and equipment, and for contingencies. To determine the amount of the surplus at the inception of this trust, the net earnings of the corporation up to January 13, 1917, the date of the donor's death, should be added to the surplus which existed on December 30, 1916. While that amount cannot be determined with absolute accuracy, the nearest approach would be to add to the surplus which existed on December 30, 1916, 14/365ths of $298,108.38, the profits for the year 1917. Upon this basis the surplus on January 13, 1917 was $1,193,391.90. This sum added to the capital account of $9,325,000 makes a total of $10,518,391.90, which figure must be adopted as the capital account of the baking company at the time of the creation of this trust, because the surplus which exists at the formation of the trust represents a part of the corpus of the estate as much as does the capital of the corporation itself. (*Matter of Osborne*, 209 N. Y. 450, 474.)

The corporation was most successful from a financial standpoint, and its profits ran into a large sum each year. Its total net income from earnings for the nine years ending December 31, 1924 was $21,441,308.73, and ran from $450,784.03 in 1916 to $5,525,559.15 in 1923.

To cover the two hundred per cent stock dividend, $4,157,340, or $15 per share for the 277,156 additional shares of stock thus issued, was transferred from the surplus of the corporation to the capital account. The common stock was carried on the balance sheet of December 30, 1922, at $7,557,340, as against $3,400,000 at the end of 1921, a difference of $4,157,340. After deducting said amount, and the dividends paid during the year, and several other items, the company had a surplus on December 31, 1922, of $1,730,787.43.

These figures show that, after charging to surplus and crediting to capital the value of the 277,156 additional shares issued to take care of this stock dividend, and after setting up reserves for depreciation of plant and equipment and for contingencies, the surplus of the corporation was $537,395.53 more than it was at the date of the creation of the trust. It is apparent, therefore, that the corpus of the estate was not invaded by the declaration of this extra dividend, and that the funds which went for that purpose were earned subsequent to the creation of the trust.

The value of the stock for the purposes of allocation between capital and income is determined by its intrinsic worth as measured by the corporate assets, and not by its market value. (*Matter of Osborne*, 209 N. Y. 450, 485; *Baldwin* v. *Baldwin*, 159 Md. 175,

183; *Smith's Estate,* 140 Penn. St. 344, 357; *Stokes' Estate,* 240 id. 277, 285.)

Without wearying the reader with more detailed figures, suffice it to say that the book value of the seven per cent participating preferred stock held by the trustee at the date of the creation of the trust, ascertained by dividing the capital and surplus of the corporation existing at the time the trust was created by the number of shares of the corporation then outstanding, was less than the book value of the new preferred and the new common after the additional stock to pay the stock dividend had been issued.

The expert accountant, called by the special guardian of the infant remaindermen, fixes the book value of the new common stock on January 3, 1922, the date when it was received by the trustee, at $46.278 per share. That would make the 814 shares held by the trustee worth $37,670.29. The same witness places the value of the same stock after the stock dividend had been declared at $22.0194 per share. Upon this basis, the 2,442 shares held by the trustee would be worth $53,771.37. The difference, $16,101.08, respondent claims represents the increase in book value between those two dates. That would be the equivalent of 731 shares of the 1,628 shares received by the trustee as the dividend. Upon that basis respondent claims, and the surrogate has held, that these 731 shares should go to the life beneficiary, and that the balance, or 897 shares, representing the amount taken out of corpus, should go back in the trust fund.

This moves the date when the comparison of the value of the stock should be made from January 13, 1917, on which day the decedent died and the trust came into existence, to January 3, 1922, when the old seven per cent participating preferred stock was exchanged for the new preferred and the new common.

Had the investment in this new stock been made on January 3, 1922, its value on that date would have to be preserved. But no property was purchased on that day, and no new investment was made. There was only an exchange of one issue of stock for another which had been authorized to take the place of the old holding. The investment was made when the trust was created and when the original stock of this corporation was turned over to the trustee. The corpus as it then existed must be preserved unimpaired, rather than the corpus some five years later.

The infant remaindermen insist that the right to participate in the earnings of the bakery company above the fixed rate of seven per cent was a valuable incident of the preferred stock which was originally turned over to the trustee, and which was later exchanged for a like amount of the new preferred with no participation feature,

and a like amount of common stock, and that this fact must be taken into consideration in determining whether the corpus has been impaired.

Participating preferred stock is rare, and no case has been cited by either party directly in point. Undoubtedly this participating feature had a value. Just how much is difficult to determine. But I fail to see how such fact is material here, because for each share of the old participating stock the trustee received a share of cumulative preferred stock, which paid eight per cent instead of seven per cent, and a share of common stock, which entitled the holder to share in any dividends over and above those declared on the preferred stock, just the same as the owner would have participated had it held the old preferred stock. I fail to see, therefore, how the participating feature of the old stock is involved here.

The enormous profits of this corporation more than warranted the stock dividend which was declared. The funds used to pay this dividend were earned after the inception of the trust, and there was no invasion of the corpus of the estate. That being so, the dividend in its entirety should go to the life beneficiary.

The decree, so far as appealed from, should be reversed, and the decree modified so as to provide that all of the two hundred per cent stock dividend of the General Baking Company which was received by the trustee be allocated to income, and that the trustee be directed to pay to the life beneficiary from the sale of the class A stock of the General Baking Corporation the sum of $116,051.28, the amount received on said sale for the 1,794 shares of that stock which were received in exchange for the 897 shares of the common stock of the General Baking Company which were allocated by the surrogate to the corpus of the trust, and that 5,382 shares of class B stock of the General Baking Company received in exchange for said 897 shares of the stock of the General Baking Company be allocated to income, and that the trustee be directed to transfer and deliver the same to the life beneficiary. Appellant should have costs payable out of the corpus of the estate.

All concur.

Decree so far as appealed from reversed on the law and new provisions inserted in place thereof in accordance with the opinion, with costs to the appellant payable out of the corpus of the estate.