SARAH R. BALDWIN ET AL. *v.* KATHERINE W. BALDWIN ET AL.

[No. 7, April Term, 1930.]

*Decided May 16th, 1930.*

176

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE and SLOAN, JJ.

*Theodore J. Miller,* with whom was *Rignal W. Baldwin,* on the brief, for the appellants.

*Stuart S. Janney* and *William A. Grimes,* with whom were *Janney, Ober, Slingluff & Williams,* on the brief, for the appellee.

URNER, J., delivered the opinion of the Court.

Upon the facts presented in a special case stated under section 222 of article 16 of the Code, it is to be determined how a certain stock dividend declared by the Hanover National Bank of New York is applicable as between the corpus and income of a trust receiving the dividend on account of its holdings of originally issued stock of the bank, in which a portion of the trust funds have been invested. The trust was created by the will of Frank G. Baldwin, who died on May 10th, 1905. It was provided by the will that the income from the trust estate should be paid to the testator's widow during her life, and that after her death the principal of the estate should be divided equally among the surviving children of the testator and the descendants, *per stirpes,* of any deceased child, there being a contingent limitation in favor of two sisters and a brother of the testator in the event that none of his issue should be living at the death of the life beneficiary.

The stock on which the trust received the dividend referred to consisted of twenty shares purchased by the trustees in 1907 at the market price of $500 per share. The par value

of each share was $100 and its book value at that time was
$389. There were then 30,000 shares of the stock outstand-
ing, and the bank had a surplus of $8,000,000 and undivided
profits of $674,090.94. The aggregate of those amounts, and
of its capital of $3,000,000, was $11,674.090.94, and a divi-
sion of that total by the number of the existing shares dis-
closed the book value per share which has been stated. On
June 6th, 1922, the bank declared a stock dividend of $2,-
000,000 from its undivided profits, which had then increased
to $8,448,463.92, and its surplus to $14,000,000. This divi-
dend involved the issue of 20,000 new shares. As thus aug-
mented, the capital stock of the bank consisted of 50,000
shares, each having a book value of $509. The Baldwin
trust received thirteen and a half shares as its proportion of
that dividend, and those shares were transferred by the trus-
tees to the life tenant as income. On January 8th, 1929, a
stock dividend of $5,000,000 was declared by the bank. It
was represented by 50,000 additional shares, increasing the
whole number to 100,000, and, like the earlier stock dividend,
was described in the authorizing resolution as being "from
the undivided profits." The surplus had then grown to $15,-
000,000 and the undivided profits to $12,290,603.35, and its
capital was $5,000,000, which resources gave a book value of
$645 to each share of the outstanding capital stock. But as
the number of the shares was doubled by the second stock
dividend, the book value of each share was reduced to $322.50.
This was $67.50 less than the book value per share of the
stock in 1907, when twenty of the original shares were pur-
chased for the trust. An impairment of the trust corpus to
that extent, at the period of the second stock dividend, would
result if the estate's proportion of the new stock were to be
appropriated as a whole to the income of the trust, and such
a disposition of it is therefore resisted by the remaindermen.
It is urged on their behalf that the minimum consideration
to which they are entitled, with respect to the application of
the stock dividend of 1929, is that it should be so appor-
tioned between the life estate and remainder as to pre-
serve the value of the original trust investment in the stock.

This contention includes the claim that the market price of $500 per share for which the trust acquired twenty shares of the stock in 1907, rather than its book value of $389 per share at that time, should be the standard of the protection to be accorded to the corpus of the trust against the impairment which it would suffer if the latest stock dividend received by the trust were to be entirely allocated to income. The primary theory, however, advanced for the remaindermen, is that the stock dividend of 1929, while made possible by an accumulation of earnings since the acquisition of the investment stock by the trust, is shown by the authorizing resolution to have emanated from capital into which earnings to the requisite amount were simultaneously converted.

The appeal is from a decree awarding to the life tenant as income all of the twenty shares of stock received by the trust in pursuance of the second stock dividend, and since exchanged for sixty shares of the Central Hanover Bank & Trust Company in which the Hanover National Bank has been merged.

Except for the impairing effect of the final stock dividend upon the value of the shares previously purchased for the trust, we should have no difficulty in agreeing with the conclusion which is questioned by the appeal. It is a conceded fact that the undivided profits of the bank, earned since the trust invested in its stock in 1907, greatly exceeded the $5,-000,000 applied to the one hundred per cent. stock dividend in which the trust estate participated. The resolution declaring the dividend referred specifically to the undivided profits as the fund to be debited on account of the new issue. In referring to a coordinate credit to capital of the amount so charged against undivided profits, the resolution did not change the substance and real intent of the action to which it was directed. Unquestionably the purpose and effect of the resolution was to declare a stock dividend from accumulated earnings, and the case must be decided with due regard to that practical design and result. It is a recognized general rule in this state that the disposition of extraordinary dividends from earnings, whether declared in cash or in stock,

will depend upon the time when the funds used for the dividends were accumulated. If they were earned before the trust began, or before it acquired stock in the corporation, the dividends are held to belong as a whole to the corpus. If the dividend funds were altogether earned after the inception of the trust, or its investment in the stock, then the dividends in their entirety go to the tenant for life. But when the earnings represented by the dividends accrued partly before and partly after the trust or its interest in the stock originated, the dividends are apportioned between the life estate and the remainder according to the ratio of the earnings in the respective periods just indicated. *Thomas v. Gregg,* 78 Md. 545; *Quinn v. Safe Deposit & Trust Co.,* 93 Md. 285; *Atlantic Coast Line Cases,* 102 Md. 73; *Foard v. Safe Deposit & Trust Co.,* 122 Md. 476; *Washington County Hospital v. Hagerstown Trust Co.,* 124 Md. 1; *Northern Central Dividend Cases,* 126 Md. 16; *Miller v. Safe Deposit & Trust Co.,* 127 Md. 610; *Krug v. Mercantile Trust & Deposit Co.,* 133 Md. 110; *Spedden v. Norton,* 159 Md. 101.

In adopting for the first time, in *Thomas v. Gregg, supra,* the rule of apportionment as to extraordinary dividends on stock held in trust for successive interests, this court followed the decision of the Supreme Court of Pennsylvania in *Earp's Appeal,* 28 Pa. 367, by which the rule was originally formulated. The Maryland cases in which the rule has been recognized have not heretofore presented any question as to a depreciating effect of the dividend upon the primary value of the stock as a part of the trust estate, but in Pennsylvania the rule has been repeatedly employed in the solution of such a problem. It was said in the case of *In re Nirdlinger's Estate,* 290 Pa. 457: "Under the Pennsylvania or American rule adopted in most American jurisdictions, the rights of the life tenant and the remaindermen to an extraordinary cash or stock dividend declared during the life tenancy are determined by a division of the dividend between the claimants so as to preserve intact the book value of the devised property (the corpus) as it existed at testator's death. This was made clear by the decision in *Earp's Appeal,* 28 Pa. 368, long rec-

ognized as a leading authority. The effect of the rule is to give to the life tenant the income which has been earned since the trust came into being, but, at the same time, to preserve the value of the corpus as it was at the date of the death of the testator, or, to use a more convenient term, to preserve the intact value of the estate. This intact value includes the par value of the stock, plus any accumulation of income earned before the death of the testator. *Earp's Appeal, supra.* From it must be subtracted capital losses. *Dickinson's Estate,* 285 Pa. 449, 132 A. 352."

In the case of *In re Wittmer's Estate,* 283 Pa. 311, 129 A. 85, the court said: "In a long line of cases, beginning with *Earp's Appeal,* 28 Pa. 368, and running to *Flaccus' Estate,* 283 Pa. 185, 129 A. 74, we have consistently held that extraordinary dividends, whether of cash, scrip, or stock, if they exceed the profits earned after the beginning of a trust, must be apportioned by giving to the corpus sufficient to keep intact the value of the shares as they were at the time the trust began, and the balance to those entitled to the income of the estate." The Court of Appeals of New York, prior to the enactment of a statutory rule on the subject in that state, adopted the Pennsylvania rule in *Matter of Osborne,* 209 N. Y. 450, and discussed the principle, in part, as follows: "It is manifest that any apportionment of a dividend is more or less troublesome in the practical handling of trust estates. * * * The dividends usually declared by corporations are the ordinary dividends such as are declared from year to year or at other regular dividend periods. Extraordinary dividends are the exception. In all cases of ordinary dividends the courts uniformly hold that they should be paid to the life beneficiary of the trust in conformity with the general rule that dividends are deemed to have been earned as of the date of their declaration. In cases of extraordinary and unusual dividends declared in whole or in part from earnings actually accumulated prior to the creation of the trust or the purchase of the stock, an adherence to the rule that dividends are deemed to have been earned as of the date of their declaration in many cases shocks the sense of justice. Notwithstanding the difficulty in many

cases of apportioning dividends, it is wiser and better to leave an apportionment to courts of equity, in preference to adhering to a rule that depends more upon its simplicity and convenience of enforcement than upon justice and right. The distinction between ordinary and extraordinary dividends is necessary to make a workable rule, and at the same time preserve the integrity of the trust fund. The integrity of the trust fund and rights of the life beneficiary under the trust should each be considered, determined, and preserved by a court of equity."

The Pennsylvania rule was adopted by this court without qualification. It was chosen in preference to other rules, which, while susceptible of more convenient application in the disposition of extarordinary dividends, were also capable of causing injustice to the remaindermen or to the life tenants. In applying the apportionment rule to the disposition of a stock dividend in *Thomas v. Gregg, supra,* our predecessors said: "When it is possible for the court to ascertain to any certainty whether the distribution in the stock dividend includes net earnings, and, if so, what proportion, and also whether such earnings were intended to be made a part of the capital or merely to be used temporarily with the intention on the part of the directors of refunding them to the shareholders as income, we think it is the duty of the court to make such investigations and dispose of the stock in an equitable way between the tenants for life and the remaindermen." The decision in that case has been cited with approval in the long series of later Maryland cases already mentioned, and there is no adequate reason why we should hesitate to give full and logical effect to the rule of apportionment, in a case to which it may be appropriately applied, according to its essential purpose.

A stock or unusual cash dividend charged to earnings accumulated prior to the inception of a trust, or its acquisition of shares on which the dividend is receivable, appropriates corporate assets which contributed to the value of the stock then outstanding. It is, therefore, equitable that the portion of an extraordinary dividend attributable to earnings for such a

period should be awarded to the corpus of the trust estate. The value of the corpus, as created or invested, does not reflect a subsequent accumulation of earnings by a corporation whose stock is held by the trust, and such a fund, being income of the corporate enterprise, is, if not capitalized, properly treated also as income from the stock investment when distributed in dividends to the stockholders. The present case differs from the cited Maryland cases in the fact that the par value of the stock dividend does not exceed the earnings of the corporation for the period since the purchase of some of its shares of stock as an investment for the trust estate, but the actual value of the new stock, as representing a proportionate interest in all the corporate resources, was in excess of its accumulated earnings for the period to which we have referred. The dividend shares being equal in number to those issued previously, the effect of the dividend was to reduce by half the pre-existing book value of the earlier issues. If the whole of the stock dividend should be awarded to the life tenant as income of the trust, the prejudicial result to the corpus would be as real as that avoided in any case by the application of the apportionment rule. In our judgment it would be inconsistent with that rule to deny to the remaindermen the right to have the corpus of the trust receive a sufficient portion of the dividend shares to preserve the value which the investment stock had at the time of its purchase. The apportionment, however, should have regard to the actual or book value of the stock at that time and not to its market value. In *Northern Central Dividend Cases, supra,* no impairment of the primary value of the stock belonging to the trust was shown to have resulted from the stock dividend there considered, but it was argued "that in the adjustment of the rights between the life tenants and remaindermen the excess market value over the par value at the date on which the dividend was declared should be credited to the corpus." The court, in overruling that contention, said: "Many factors enter into the value of the stock of a corporation. The retention by the company of millions of dollars which should be distributed to its stockholders gives market value to the stock. The earning

capacity of a corporation contributes to market value, and this capacity in turn is affected by many things. The general conditions of trade, available working capital, equipment, efficiency and economy, reflected in management, and many other considerations. But stock dividends are not based upon the market value of the stock; but upon accumulated earnings of the company. In the declaration of such dividends the market value of the stock is not considered. The dividend represents the stockholder's proportion of the earnings of the company awarded to him by its authority. Such proportion of the earnings represented by the dividend as accrued during the life tenancy belongs to the life tenant."

The Supreme Court of Pennsylvania has held that the value of stock, for the purposes of the apportionment rule, should be determined by its intrinsic worth as measured by the corporate assets, and not by its market price. *In re Stokes' Estate,* 240 Pa. 277; *Smith's Estate,* 140 Pa. 344; *Biddle's Appeal,* 99 Pa. 278; *Moss's Appeal,* 83 Pa. 264. In the last cited case the court said: "Market values are well enough upon a question of distribution where the parties are about to realize; but upon a question of values between life tenants and remaindermen, a judicial decree should go down through the shifting sands of the stock market until it reaches the solid rock of actual values. The application of any other rule might work serious injustice."

The New York Court of Appeals, in *Matter of Osborne,* 209 N. Y. 450, defined the method and basis of apportionment in such cases as follows (page 485): "The intrinsic value of the trust investment is to be ascertained by dividing the capital and the surplus of the corporation existing at the time of the creation of the trust by the number of shares of the corporation then outstanding, which gives the value of each share, and that amount must be multipled by the number of shares held in the trust. The value of the investment represented by the original shares after the dividend has been paid is ascertained by exactly the same method. The difference between the two shows the impairment of the corpus of the trust. If the dividend is of money, the amount of that differ-

184

ence is to be retained by the trust as capital and the remain-der paid to the life beneficiary. If the dividend is in stock, the amount of the impairment in money must be divided by the intrinsic value of the shares of the new stock and the quotient gives the number of shares to be retained to make the impairment good; the remaining shares going to the life beneficiary. Market value, good will, and like considerations, cannot be considered in apportioning a dividend."

If the market price at which the trustees in this case invested in the stock of the Hanover National Bank should be considered upon the question of impairment by the stock dividend with which we are here concerned, its market value since the dividend would properly be the other basis of comparison, and that appears not to have been reduced below the price which the trustees paid. But for the loss of intrinsic value sustained by the investment stock in consequence of the stock dividend it is right that the corpus should be compensated by an equitable apportionment. The intrinsic value of the twenty shares bought for the trust in 1907 was $389 per share, or a total of $7,780. That value was reduced to $322.50 per share, or a total of $6,450, by the stock dividend of 1929. The loss of intrinsic value thus occasioned was therefore $1,330. To protect the trust estate from such an impairment it is necessary to award the corpus 4.124 of the twenty dividend shares received by the trust, which, at the book value rate of $322.50, had a total intrinsic value of $1,330 at the dividend period. The remaining 15.876 of those shares were distributable as income to the tenant for life. In accordance with the division thus indicated, the shares of stock of the Central Hanover Bank & Trust Company for which the trust's dividend stock of the Hanover National Bank was exchanged, after the merger of those institutions, should be apportioned between the interests for life and in remainder.

*Decree reversed and cause remanded for a decree in conformity with this opinion, the costs to be paid out of the corpus and income of the trust in equal proportions.*

PARKE, J., dissents.